T.C. Memo. 1998-45

UNITED STATES TAX COURT

DWIGHT L. MCKENNA AND BEVERLY S. MCKENNA, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26334-92.                    Filed February 5, 1998.

Edward B. Mendy, for petitioners.

Kathleen O. Lier, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, Judge:  Respondent determined deficiencies in
petitioners' Federal income taxes and additions to tax, as
follows:

| | | Additions to Tax | | | |
|------|------------|------------------|------------------|---------------|-----------|
| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6653(b)(1) | Sec. 6661 |
| 1987 | $67,485 | $50,614 | [1] | | $16,871 |
| 1988 | 49,419 | | | $37,064 | 12,355 |

[1] 50 percent of the interest due on $67,485.

Respondent determined, in the alternative to the fraud additions to tax, that petitioners are liable for the negligence additions to tax under section 6653(a)(1)(A) and (B) for 1987 and section 6653(a)(1) for 1988.

Unless otherwise indicated herein, all section references are to the Internal Revenue Code in effect for the years 1987 and 1988, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In respondent's answer filed on January 29, 1993, it is conceded that the fraud additions to tax for 1987 and 1988 are not due from petitioner Beverly S. McKenna.

The issues for decision are:

1.  Whether voluntary payments made by petitioners were properly assessed when they were received by respondent along with unsigned amended Federal income tax returns for 1987 and 1988 prior to sending the notice of deficiency.

2.  Whether petitioners failed to report Schedule C income from petitioner Dwight L. McKenna's medical practice in the amounts of $175,285 for 1987 and $191,979 for 1988.

3.  Whether petitioner Dwight L. McKenna is liable for the additions to tax under section 6653(b)(1)(A) and (B) for the fraudulent underpayment of his Federal income taxes for 1987, and under section 6653(b)(1) for the fraudulent underpayment of his Federal income taxes for 1988.

4. Whether petitioners are liable for the substantial understatement additions to tax under section 6661.

5. If petitioner Dwight L. McKenna is not liable for the fraud additions to tax, whether petitioners are liable for the negligence additions to tax.

6. Whether the assessment of petitioners' Federal income taxes for 1987 is barred by the statute of limitations.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Dwight L. McKenna and Beverly S. McKenna resided in New Orleans, Louisiana, at the time they filed their petition in this case. Their joint Federal income tax returns for 1987 and 1988 were filed with the Internal Revenue Service on August 15, 1988, and September 5, 1989, respectively.

Dwight L. McKenna's Background

Dwight L. McKenna (hereinafter petitioner) was born and raised in New Orleans. He attended elementary, high school, and college there. He received his medical training at Meharry Medical College in Nashville, Tennessee, from which he graduated in 1966. He interned at the University of Missouri, Kansas City General Hospital, and later took his residency in surgery at Howard University in Washington, D.C. After a tour of duty as a

surgeon in the U.S. Army, he returned to New Orleans in 1973 to begin his medical practice. He was associated as an independent contractor with Flint-Goodrich Hospital, then the only black owned hospital in the city of New Orleans. He then treated mostly poor people who had either Medicaid or Medicare. He also worked in neighborhood health clinics and as an assistant coroner. When Flint-Goodrich Hospital was closed in 1983, petitioner obtained privileges at St. Claude General Hospital, now known as United Medical Center, and he started a private medical practice at 1827 Gentilly Boulevard in New Orleans. During 1987 and 1988, the years involved in this case, the Gentilly location was petitioner's principal place of business.

Petitioner became a prominent citizen in New Orleans. He was a founding member of the Black Economic Development Council, the purpose of which was to advocate the establishment and progress of African American business in New Orleans. To that end, the Council met with state and local agencies, asking them to involve minorities in business decisions. In 1987 and 1988 petitioner was a member of the board of directors of the First Federal Savings Bank of New Orleans. In 1986 he was elected a member of the Orleans Parish School Board to fill a vacated seat, and he was elected in 1988 for a full 4-year term. In 1988, he was elected president of the School Board by the other members of the board. As a member of the School Board, he received campaign

contributions, and he was required to file a report declaring those contributions. He made copies of each check for purposes of reporting the contributions on the report. He reported the total amount of his contributions.

Petitioner's Medical Practice in 1987 and 1988

For 1987 and 1988, petitioner's income and expenses of his medical practice were reported on Schedule C, Profit or (Loss) From Business or Profession. He was the stated proprietor.

During 1987 and 1988, and for several prior years, many of petitioner's patients were referred to him by personal injury attorneys. These patients had been involved in some type of accident and required medical attention. Petitioner would generally treat each patient and send the patient's bill directly to the patient's attorney. He received payments for these services from the patient's attorney, and the payments were taken from the settlement proceeds of, or recoveries from, the personal injury case.

In 1987 petitioner received 990 checks from 63 attorneys, insurance companies, and governmental agencies, in the total amount of $577,285.94. He knew that each of these checks was income to him.

In 1988 petitioner received 864 checks from 65 attorneys, insurance companies, and governmental agencies, in the total

amount of $441,662.05. He knew that each of these checks was income to him.

In 1987 and 1988 petitioner knew that he had an obligation to report all of his income on his Federal income tax returns, whether received by check or cash.

Petitioner knew that he would receive a Form 1099 representing income he received for services rendered to Medicare and Medicaid patients. He knew that this information would be sent to the Internal Revenue Service. He also knew that he was not going to receive Forms 1099 from about 98 percent of the attorneys who were issuing checks to him for payment of medical services to their clients.

Petitioner made a copy of each check he received from an attorney in 1987 and 1988. He would then add the checks each week and make a notation to himself. He would keep a running total for the entire year.

Although petitioner claimed that he kept a handwritten list of the amounts of the various checks he received in 1987 and 1988, he never gave the list to Michael Bruno (Mr. Bruno), his certified public accountant.

Petitioner usually hand delivered his bill for medical services on behalf of certain patients to attorney Louis Gerdes (Mr. Gerdes). This occurred during 1987 and 1988 when petitioner received 278 and 188 checks, respectively, from Mr. Gerdes.

In addition to the checks received by petitioner in 1987 and 1988, he would also receive cash from some patients, usually $50 to $100 per week. He did not include this cash in the calculation of his income.

In the Schedule C for petitioner's medical practice, gross income was reported in the amounts of $402,000 for 1987 and $250,000 for 1988.

Petitioner understated the Schedule C gross income from his medical practice in the amounts of $175,285 for 1987 and $191,979 for 1988. The correct gross income received from his medical practice was $577,285 for 1987 and $442,262 for 1988. There was a 30-percent omission of gross income in 1987 and a 43-percent omission in 1988.

## Petitioners' Return Preparers

From 1978 through 1990 petitioners' Federal income tax returns were prepared by their accountant, Mr. Bruno, and his accounting firm, Bruno and Tervalon. Mr. Bruno was managing partner of the firm. Marie Walters, a C.P.A., assisted Mr. Bruno in preparing petitioners' income tax returns for 1987 and 1988.

## Petitioner's Banking Practices at First Federal Savings Bank

Petitioner had a checking account in his name at First Federal Savings Bank (First Federal) in which he deposited checks received from personal injury lawyers. Prior to 1987, he deposited into that account all the checks he received. But he

changed that practice in 1987 when he began transacting business at the Read Branch of First Federal, primarily with two tellers, Marilyn Clark and Ann Hattier, who both knew him as a customer and as a member of the bank's board of directors.  Petitioner usually visited the Read Branch three or four times each week.  On each occasion he would bring in a group of third party checks made payable to him.  He would tell either Ms. Clark or Ms. Hattier that he wanted to exchange the checks for a First Federal bank check, but he did not want them or cash deposited to his checking account.  A First Federal bank check was one that was drawn on the bank's own account.

To exchange the third party checks for bank checks, the teller would add the amounts of the checks, determine a total, and deposit them to the First Federal suspense account, not to petitioner's checking account.  She would then issue a First Federal bank check in the same amount as the total of the third party checks.  This procedure was followed each time the teller issued a First Federal bank check to petitioner.  By exchanging the third party checks for bank checks in this manner, the total amount of the third party checks or the bank check would not be reflected in petitioner's bank account or in his bank statement.  Of all the First Federal bank checks the tellers issued to petitioner, only one was ever brought back to the teller for deposit to his checking account or to be cashed.

On some occasions petitioner would deposit a group of third party checks. He would tell Ms. Clark, and she would write his account number on the checks. He never had a deposit slip, so Ms. Clark prepared one for him. The deposits of these third party checks into his checking account were reflected in his bank account and in his bank statements.

Except for petitioner, Ms. Hattier never handled a transaction for any other customer or board member where she accepted third party checks, deposited them into the First Federal suspense account, and then issued a First Federal bank check in the total amount of the third party checks.

Petitioner's Use of First Federal Bank Checks

All of the First Federal bank checks were made payable to petitioner, and none of them were reflected in his First Federal checking account.

In 1987, petitioner procured at least 52 bank checks from First Federal which were made payable to him in the total amount of $189,211.97.

In 1988, petitioner procured at least 29 bank checks from First Federal which were made payable to him in the total amount of $116,646.73.

Petitioner endorsed each First Federal bank check. Of the First Federal bank checks, he deposited 39 of them with Shearson/American Express for investments during 1987 and 1988.

He also deposited 30 bank checks with Howard, Weil, Labouisse, Friedrichs, Inc., another investment company, during 1987 and 1988. In 1988 petitioner also deposited two First Federal bank checks with Trans American, and one bank check with New York Life Insurance Company. The proceeds from the bank checks were used by the investment companies to buy tax free bonds and stocks.

Petitioner's Cashing of Checks at Circle Food Store

Betty Hebert was employed by Circle Food Store in 1987 and 1988. In 1988, she was the financial manager.

During 1987 and 1988, as well as other years, Circle Food Store offered a check cashing service. It would charge a fee to cash a check. The fee would range from 75 cents to $3.50, depending upon the amount of the check being cashed. Once Circle Food Store cashed the person's check, it would deposit that check into its own bank account.

During 1987 petitioner cashed 135 income checks at Circle Food Store which were written by attorneys or other third parties. The total amount of these checks was $85,493. During 1988 petitioner cashed 63 third party checks at Circle Food Store. The total amount of these checks was $30,629.50.

During 1987 and 1988, as well as other years, Circle Food Store had an arrangement with attorney Louis Gerdes by which his checks could be cashed at Circle Food Store. During 1987 and

1988 some of Mr. Gerdes' checks were returned to Circle Food Store for non-sufficient funds, or NSF.

Circle Food Store would assess Mr. Gerdes a $15 NSF charge. Ms. Hebert or another employee of Circle Food Store would usually go to Mr. Gerdes' office, and he would issue a replacement check to Circle Food Store, which included the amount of the check and the NSF fee. At some point in 1988, Circle Food Store stopped cashing Mr. Gerdes' checks because he refused to pay the NSF charge, although he would issue another check for the amount of the overdraft check. Circle Food Store never approached petitioner and told him that he had to repay the amount he received from one of Mr. Gerdes' checks.

Petitioner's Cashing of Checks at Liberty Bank

During 1987 petitioner cashed 60 income checks at Liberty Bank which were written by attorneys or other third parties. The total amount of these checks was $37,540. During 1988 petitioner cashed 40 third party checks at Liberty Bank. The total amount of these check was $23,005.

Petitioner Beverly McKenna's Newspaper Business

On their 1987 and 1988 joint Federal income tax returns, petitioners filed a second Schedule C for a newspaper business operated by Beverly McKenna. For 1987 and 1988, the gross income and deductions were correctly reported.

The operation of the newspaper was an expensive venture, which was financed by petitioner. In 1987 the newspaper had a net loss of $8,184 and in 1988 it had a net profit of $6,046. Mrs. McKenna was able to operate the newspaper and continue to maintain her lifestyle, household, and children's education because of petitioner's medical practice.

Mr. Bruno and his accounting firm performed full accounting services for Mrs. McKenna's newspaper business. This service included a compilation of the accounting records, general ledger, and annual financial statements. For 1988, the compilation work was performed by Marie Walters.

When Mrs. McKenna started her newspaper in 1985, she decided to have full accounting services performed. This decision was made because she did not feel comfortable handling this aspect of the business by herself. Once Mrs. McKenna turned the newspaper records over to Bruno and Tervalon, she relied upon the accounting firm to process the records properly.

When Mrs. McKenna received revenues from the sale of advertisements in her newspaper, she deposited those revenues into her bank account. By giving her bank statements to Bruno and Tervalon, it was her belief that Mr. Bruno's firm had sufficient information to determine the newspaper's income.

These accounting records were prepared based on bank statements and canceled checks brought to Bruno and Tervalon by Mrs. McKenna throughout each year.

In preparing the Schedule C for the newspaper business, Mr. Bruno's firm would rely upon the information on the year-end financial statement or the trial balance.

To determine the income derived by the newspaper business, Bruno and Tervalon relied upon the deposits reflected on the newspaper's bank statements.

In addition to these services, Bruno and Tervalon also prepared the payroll returns for the newspaper.

Petitioner's Medical Practice and Types of Records Maintained for That Business

Mr. Bruno's firm did not perform full accounting services for petitioner's medical practice. Bruno and Tervalon only performed payroll tax preparation for the medical practice. The payroll tax returns were handled separately from the income tax return preparation.

At different times prior to the Internal Revenue Service's examination, Mr. Bruno had suggested to petitioner that Bruno and Tervalon perform full accounting services for the medical practice. Petitioner, however, never retained Bruno and Tervalon to perform such services. Petitioner told Mr. Bruno that it would be difficult to use his bank statements to generate the

compilations because the account contained too much personal type information, including other income from investments.

In New Orleans, where petitioner practices medicine, an occupational license tax was due to the city. This occupational license tax was computed based upon a certain percentage of the gross income of the business. Bruno and Tervalon did not prepare petitioner's 1987 and 1988 occupational license tax forms.

Petitioner told Mr. Bruno that he deposited all of his income into his First Federal checking account. He further stated that he maintained a total of his income throughout the year. When he brought his tax information to Mr. Bruno, petitioner gave him a total gross income figure for the year.

Petitioner did not tell Mr. Bruno that he was cashing some of his income checks at Circle Food Store, and that he did not deposit such funds into his checking account.

Petitioner did not tell Mr. Bruno that he was cashing some income checks at Liberty Bank, and that he did not deposit such funds into his checking account.

Petitioner did not tell Mr. Bruno that he took income checks to First Federal and that he exchanged those checks for bank checks drawn on First Federal's suspense account.

Preparation of Petitioners' 1987 and 1988 Income Tax Returns

In preparing the Schedule C for the newspaper business for 1987 and 1988, Mr. Bruno's firm relied upon the information on

the yearend financial statement or the trial balance. This had been prepared as a part of its full accounting services and was based upon information furnished by Mrs. McKenna.

For the remaining items on petitioners' Federal income tax returns, petitioner always brought the information necessary for the preparation of the returns to Mr. Bruno. This would include the information relating to his medical practice, all Forms W-2 and 1099, all information regarding rental property, and all other information relating to personal items.

For petitioners' 1987 and 1988 returns, Marie Walters took the information given by petitioner to Mr. Bruno, compiled that information, prepared the tax returns, and returned them to Mr. Bruno for review.

For the taxable years 1987 and 1988, Mr. Bruno had discussions with petitioner advising him that petitioners' total income had to be reported on their tax returns and that there should be an attempt to reconcile the income going into petitioner's bank account with the income being reported. Petitioner was told that income taxable to him would include checks and cash that he received from his medical practice for the payment of services.

For the preparation of the income tax return for 1987, petitioner gave Mr. Bruno a sheet on which he had written the words "Income Statement". He orally told Mr. Bruno that his

total income for 1987 was $410,000, and this was the income reported to the city of New Orleans for occupational license purposes. On the sheet marked by petitioner as the Income Statement, Mr. Bruno wrote: "$410,000 (includes 1099s) to City of NO (for the payment of license)."

On the 1987 income tax return, line 1a of the Schedule C for the medical practice reflected gross receipts or sales of $376,206. Since petitioner told Mr. Bruno that the total income figure of $410,000 included his Form 1099, the total amount of the Forms 1099 in the amount of $25,794 was reported on line 4 of the Schedule C. The gross income for the Schedule C reflected on line 5 was $402,000.

Petitioner told Mr. Bruno that the amount of $410,000 included $8,000 shown on a Form W-2. Thus, the remaining $8,000 of the $410,000 was shown on line 7 of the first page of petitioners' return. Since the actual amount of income shown on that Form W-2 was $8,972.53, this was rounded to $8,973 and listed on line 7.

For the taxable year 1988 petitioner gave Mr. Bruno a single sheet of paper on which he wrote "Income, 250,000 office income."

Since petitioner gave Mr. Bruno certain Forms 1099 reflecting income from his medical practice, the Form 1099 income was again segregated from the other medical practice income. Mr. Bruno's firm added the Forms 1099 and attached the adding machine

tape on the page furnished by petitioner which stated his office income.  The Form 1099 income was then placed on line 4 of the Schedule C for other income, while the remaining income was included on line 1 of the 1988 Schedule C reflecting gross receipts.  The gross income stated on line 5 of the Schedule C was $250,283.

For the preparation of the returns for 1987 and 1988, petitioner did not give Mr. Bruno copies of any of the checks representing income he had received from the various personal injury attorneys.  He only gave Mr. Bruno the canceled checks representing expenses.  The first year he furnished copies of these income checks to Mr. Bruno was during the preparation of the 1989 income tax return, after the commencement of the Internal Revenue Service examination.

When petitioner gave Mr. Bruno the amount of income for 1987 and 1988, he did not furnish him with any bank statements or other books or records to support his determination of income. Petitioner had told Mr. Bruno that he determined his income from information maintained on patient billings in his files.  He did not tell Mr. Bruno that the income amounts were only estimates.

In addition to petitioner's income from his medical practice, he also told Mr. Bruno the amount of income petitioners had received on each piece of their rental properties.

Mr. Bruno and his firm determined the expenses and deductions for the 1987 and 1988 income tax returns based upon information furnished by petitioner, who labeled a group of white envelopes with different types of expenses. These expenses included those for the medical practice and the rental property. After petitioner segregated his canceled checks by expense category and placed them in the appropriate envelopes, he gave the envelopes to Mr. Bruno when they met to discuss the preparation of petitioners' 1987 and 1988 income tax returns.

After his meetings with petitioner regarding the 1987 and 1988 income tax returns, Mr. Bruno gave the Income Statement and various envelopes to Ms. Walters. She added the various expenses, determined the deductible expenses, and included those on the income tax return. Ms. Walters prepared the 1987 and 1988 income tax returns based on the submitted information, and the returns were subsequently reviewed by Mr. Bruno with Ms. Walters present. Ms Walters had no direct discussions with petitioner regarding the preparation of the 1987 and 1988 income tax returns. Mr. Bruno ultimately signed the returns.

On one occasion, Ms. Walters asked Mr. Bruno if petitioner could furnish his bank statements. Mr. Bruno advised that he had requested the bank statements, but petitioner never furnished them.

After Mr. Bruno reviewed and signed the 1987 and 1988 returns, he met with petitioner, and they reviewed the completed returns together, including the Schedules C for the medical practice. Petitioner never indicated that there was an error on the 1987 and 1988 income tax returns, particularly with respect to the amounts reported as income on the medical business Schedules C.

Bruno and Tervalon also prepared petitioners' income tax returns for 1989 and 1990. For these years, petitioner did not furnish one lump-sum figure to Mr. Bruno or Ms. Walter. Instead, he submitted copies of the checks he had received as income from the various personal injury attorneys.

Internal Revenue Service's Civil Examination

Susan Davis was a revenue agent employed by the Internal Revenue Service from October 1987, through May 1994. She had an accounting degree and had also received extensive training throughout the course of her employment with the Service.

In October 1989, Ms. Davis was assigned to conduct an examination of petitioners' 1987 Federal income tax return. She initially contacted petitioner by telephone on October 5, 1989, and advised him that his and his wife's 1987 return had been selected for examination. When Ms. Davis asked that an appointment be scheduled, petitioner told her that she would have to contact his certified public accountant, Mr. Bruno. Since no

power of attorney form had been filed, she asked that Mr. Bruno contact her. He telephoned her the same day, and they confirmed an appointment date.

On October 5, 1989, Ms. Davis sent a letter to petitioners confirming the initial appointment on October 27, 1989. To that letter, she attached an Information Document Request, Form 4564, (hereafter IDR) dated October 5, 1989. The IDR requested, among other items, all of the petitioners' bank statements, canceled checks, and duplicate deposit slips, as well as information with respect to invested funds. Petitioner provided Mr. Bruno with a copy of the letter and the IDR.

When Ms. Davis first met with Mr. Bruno, petitioner was not present. Mr. Bruno appeared to have a limited knowledge of and records for petitioner's medical practice and the income and expenses claimed for 1987 and 1988. However, he was familiar with Mrs. McKenna's newspaper business and made the records available. After examining the newspaper business records, Ms. Davis determined that each Schedule C for the newspaper for 1987 and 1988 was correct and no adjustment was made. Similarly, after examining the information regarding petitioners' rental property and the income derived therefrom, Ms. Davis determined that the income was correctly reported and there were no adjustments with respect to the rental property.

Mr. Bruno advised Ms. Davis that similar full accounting services were not performed by his firm for petitioner's medical practice. To determine income, he stated that petitioner kept such information and that he relied upon the total dollar figures furnished to him by petitioner. Based upon such representations to him, Mr. Bruno advised Ms. Davis that he thought all of the income was deposited into petitioner's bank account. To determine expenses for the medical practice, unlike his method for giving an income figure to Mr. Bruno, petitioner gave Mr. Bruno envelopes that contained canceled checks and expense receipts.

Because Mr. Bruno had a limited knowledge of petitioner's medical practice income, and additional information was needed, Ms. Davis requested that Mr. Bruno schedule an appointment with petitioner so that information could be obtained about the medical practice and how petitioner determined the income figures on his Schedule C.

At Ms. Davis' first meeting with Mr. Bruno, she submitted to him a second IDR dated October 27, 1989, which requested: "All other statements for all bank accounts. This includes checking, savings, and investment accounts". Mr. Bruno sent a copy of this IDR to petitioner and told him the requested documents had to be produced.

Information from the statements regarding deposits was essential because Ms. Davis was attempting to verify the income claimed by petitioner through the bank deposit method. Absent such information she would not be able to correctly determine if petitioner's income was accurately reported. At some point during the examination, Mr. Bruno became aware that Ms. Davis was attempting to verify the medical practice income through the bank deposit method.

On November 2, 1989, Ms. Davis met with petitioner and Mr. Bruno at Mr. Bruno's office to conduct her initial interview of petitioner. At that meeting petitioner told her that during 1987 and 1988 most of his patients were personal injury patients. When he received checks for payment of his services, he stated that he deposited them into his First Federal checking account. He stated that he kept up with his income in his head.

On November 22, 1989, Ms. Davis submitted a third IDR to Mr. Bruno. It again requested: "All bank statements (not previously submitted) for all accounts. This includes checking, savings and investment accounts. Canceled checks and deposit slips should be presented with the bank statements". Mr. Bruno sent a copy of this IDR to petitioner and advised him that the requested documents had to be produced.

On December 8, 1989, Ms. Davis met with petitioner, Mr. Bruno, and two of petitioner's attorneys at petitioner's medical

office. The purpose of the meeting was to tour the medical practice. At that meeting Ms. Davis asked for canceled checks, which had been listed in the three IDR's. Petitioner told her that he had given the checks to Mr. Bruno, he had returned them, and then the checks were stolen out of his automobile. Also during that meeting petitioner stated that each patient's medical file contained copies of each check he had received from the patient's attorney for the payment of medical services rendered.

Ms. Davis requested access to petitioner's patient files and a list of the attorneys who had made payments to him. The purpose of the request was to locate the attorneys who had paid petitioner and independently verify the amounts paid to him during 1987. Petitioner would not release the patient files because of the patient-physician privilege. He told Ms. Davis that he did not possess a list of the attorneys with whom he dealt, and he did not offer to write down the names of the attorneys for her. He again stated that he kept a running total of his income in his head.

Up to and immediately after the December 8, 1989, meeting, Ms. Davis had received no information regarding any of petitioner's investment accounts, despite three IDR's requesting that information. Mr. Bruno relied on petitioner to furnish him with the documents requested in each of the three IDR's. To the extent Mr. Bruno had the requested documentation in his

possession, he gave it to Ms. Davis.  Despite three separate requests for investment accounts, Ms. Davis discovered one of the investment accounts herself when she was reviewing certain canceled checks.  On one of these checks, she saw the name "Shearson Lehman".  When asked about the investment accounts, Mr. Bruno told her there was an investment account with Shearson.  He further stated that he believed all of the money in the Shearson account represented transfers from petitioner's checking account.  This categorization of the Shearson deposits as transfers from the checking account was significant because, if accurate, they would have represented nontaxable income already considered as income by Ms. Davis in her review of the account.

Petitioners' 1987 income tax return did show interest received from Shearson.  Ms. Davis did not receive an IRP document, which is a document internally processed by the Service and lists interest income, capital gains, et cetera, reported to the Service.  However, neither the interest amount reported on the return nor the IRP document would have provided or given access to the detailed statements.  Without these detailed statements, Ms. Davis would not have been able to determine whether income had been deposited or withdrawn from that account, and whether the interest income or capital gains were earned from moneys placed in the account 10 years before or during the same year.

The IDR's did ask for specific documents for specific bank accounts. None of the accounts specifically listed on each of the IDR's was the Shearson account.

Ms. Davis then specifically asked for and, in January 1990, received the Shearson account records. When she received and analyzed the records, she discovered that the majority of the deposits to the investment account were not transfers or traceable from petitioner's checking account or any other account. Thus, she determined that petitioner did not deposit all of his income into his checking account.

After reviewing the Shearson accounts, Ms. Davis' bank deposit analysis showed that petitioner had understated his medical practice income in 1987 by $250,000. She gave this calculation to Mr. Bruno, asked that he review it with petitioner, and asked that he identify any nontaxable deposits she had not previously identified. At that point, Mr. Bruno attempted to reconcile and explain the difference.

During the period when Mr. Bruno was attempting to reconcile the $250,000 difference, petitioner did not inform him that, rather than making deposits in his bank account, he was cashing checks at Circle Food Store and Liberty Bank, or that he was exchanging income checks for First Federal bank checks. Instead, Mr. Bruno continued to work with the incorrect belief that petitioner deposited all of his income checks into his First

Federal checking account.  Mr. Bruno did not know petitioner was cashing and exchanging checks until testimony was given before the grand jury on May 25, 1990.

Throughout the course of Ms. Davis' examination, petitioner never told Mr. Bruno that the income figures he gave to him for 1987 and 1988 were incorrect.  Similarly, throughout the ensuing criminal investigation in which Mr. Bruno assisted in the representation of petitioner, Mr. Bruno was never told that the income figures were incorrect.

Mr. Bruno subsequently furnished Ms. Davis with information which attempted to establish the nontaxable nature of $100,000 of the understatement.  Since the amount of $150,000 still remained unexplained, Ms. Davis determined that it represented unreported income.  She then explained that the Service likely would want to begin an examination of petitioners' 1988 income tax return. After consulting with her supervisor, Ms. Davis told Mr. Bruno that the subsequent year examination would be commenced.

In March 1990, two attorneys, Mr. White and Mr. Gray, representing petitioners with a valid power of attorney, went to Ms. Davis' office and requested that they meet with her and her manager.  Mr. White thought Ms. Davis had completed the examination for both 1987 and 1988, although she had not begun the examination for 1988.  Although the then proposed deficiency for 1987 was approximately $50,000, Mr. White stated that

petitioners wanted to agree to the liability because it was "pocket change". Mr. White also expressed concern that the case would be referred to the Criminal Investigation Division.

Shortly after the March 1990 meeting, Ms. Davis was advised to suspend her examination because petitioner had become the subject of a criminal investigation.

During her examination of petitioners' returns, Ms. Davis was not told that petitioner had an investment account with the brokerage firm of Howard, Weil, Labouisse Friedrichs, Inc., and she received no investment account information pertaining to that company.

During the examination petitioner did not tell Ms. Davis that he had cashed checks and had not deposited them into his checking account.

During the examination petitioner did not tell Ms. Davis that he was going to First Federal and exchanging income checks he had received from personal injury attorneys for First Federal bank checks.

Petitioner's Criminal Conviction Under Section 7206(1).

On September 19, 1991, petitioner was indicted by the Grand Jury for the United States District Court for the Eastern District of Louisiana on two counts of violating section 7206(1) for the taxable years 1987 and 1988. The indictment charged petitioner with making false statements on his Federal income tax

returns by underreporting his income for 1987 and 1988 in the respective amounts of $175,285 and $191,979.

After a plea of not guilty and a criminal trial, a jury, on February 15, 1992, found petitioner guilty of both charges of violating section 7206(1) as contained in Counts 1 and 2 of the Indictment.

Subsequent to the jury's verdict in the criminal case, petitioner filed a motion for a new trial which was denied. McKenna v. United States, 791 F. Supp. 1101 (E.D. La. 1992), affd. without published opinion 980 F.2d 1443 (5th Cir. 1992).

On April 29, 1992, U.S. District Judge Charles Schwartz, Jr., executed the Judgment and Probation/Commitment Order in petitioner's criminal case.  The Court sentenced petitioner to be imprisoned for 15 months, fined him $4,000, assessed him with costs of prosecution in the amount of $5,064.49, and ordered him to pay a special assessment of $100.  In addition, petitioner was ordered to cooperate with the Internal Revenue Service to resolve his tax indebtedness.

Petitioner appealed the judgment of conviction.  In an unpublished opinion, the Court of Appeals for the Fifth Circuit affirmed the judgment of conviction on December 2, 1992, at 980 F.2d 1443 (5th Cir. 1992).  Petitioner did not file a petition for writ of certiorari with the Supreme Court of the United States.

Petitioner subsequently filed a pro se application seeking issuance of a writ of habeas pursuant to 28 U.S.C. sec. 2255. On July 29, 1993, U.S. District Judge Schwartz entered an Order and Reasons denying petitioner's motion. Petitioner appealed the District Court's denial of his motion under 28 U.S.C. sec. 2255 to the Court of Appeals for the Fifth Circuit. On June 3, 1994, the Court of Appeals filed its opinion affirming the District Court's denial of petitioner's motion.

Amended Returns Prepared by Petitioners and Their Additional Tax Payments.

On June 29, 1992, the Internal Revenue Service received Forms 1040X, Amended U.S. Individual Income Tax Returns, for petitioners' 1987 and 1988 tax years. The 1987 Form 1040X reflected additional income in the amount of $177,285, and the 1988 Form 1040X reflected additional income in the amount of $191,979. The Internal Revenue Service Center rejected both the 1987 and 1988 Forms 1040X and did not file them because petitioners did not sign them.

On June 29, 1992, the Internal Revenue Service received, along with unsigned amended returns (Forms 1040X), petitioners' voluntary payments in the following amounts:

| Taxable Year | Designated Payment of Tax | Designated Payment of Interest |
|---|---|---|
| 1987 | $93,548.78 | $38,011.24 |
| 1988 | 61,533.72 | 19,618.23 |

Pursuant to the 1987 and 1988 unsigned amended returns and voluntary payments, respondent assessed additional taxes in the amounts of $68,255 on September 17, 1992, for 1987, and $48,887 on September 1, 1992, for 1988.

OPINION

Issue 1.  Assessments of Voluntary Payments

Petitioners contend that their voluntary payments submitted with unsigned amended income tax returns were improperly assessed.  After entry of the judgment of conviction in the criminal tax case against petitioner, and while it was on appeal, petitioners made the voluntary payments to respondent.

In the notice of deficiency dated September 4, 1992, respondent determined that there were deficiencies in income taxes due from petitioners in the amounts of $67,485 and $49,419 for 1987 and 1988, respectively.  In paragraph 3 of their petition filed on November 27, 1992, petitioners conceded the deficiencies in income taxes for 1987 and 1988.

On August 10, 1994, petitioners filed an amended petition. In paragraph 2 they alleged that the deficiencies for 1987 and 1988 were in dispute.  In paragraph 3 of the amended petition, however, they limited this "dispute" to an alleged error by respondent in assessing the deficiencies.  The facts stated in paragraph 4 of the amended petition and the prayer for relief are centered around respondent's assessments of the taxes.

Prior to the issuance of respondent's notice of deficiency, petitioners submitted unsigned amended income tax returns to respondent for 1987 and 1988. The 1987 amended income tax return showed an increase in tax of $68,255. The 1988 amended income tax return showed an increase in tax of $48,887. Respondent received these returns on June 29, 1992. However, the amended returns were not signed by petitioners, but only by their return preparer, T.E. Mitchel. Respondent rejected both amended returns because they were not signed by petitioners.

Along with the unsigned amended returns, petitioners made voluntary payments to respondent in the total amounts of $131,560.02 and $81,151.95. As a result of these voluntary payments, respondent assessed additional tax in the amounts of $68,255 on September 17, 1992, for 1987, and $48,887 on September 1, 1992, for 1988. The amounts of these assessed deficiencies were determined based upon the increased tax liabilities reflected on petitioners' amended, albeit unsigned, returns.

Section 6213(b)(4) permits the assessment of tax that has been paid by a taxpayer regardless of the restrictions set forth in section 6213(a). Petitioners do not dispute that the assessments were of amounts paid as a tax or in respect of a tax within the meaning of section 6213(b)(4). Accordingly, respondent's assessments of the increased taxes for 1987 and 1988 were proper. In any event, petitioners will receive credit for

their voluntary payments against any deficiencies and additions to tax determined by this Court to be due for 1987 and 1988.

Issue 2.  Unreported Income

Petitioner has the burden of proving that he did not understate his gross income from his medical practice by $175,285 for 1987 and $191,979 for 1988, as determined by respondent. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  He failed to carry that burden.

Paragraph 16 of the first stipulation of facts filed with the Court on the first day of trial states as follows:

> The Schedule C gross income was understated from petitioner Dwight McKenna's medical practice for the taxable years 1987 and 1988 in the respective amounts of $175,285.00 and $191,979.00.  The correct gross income for the medical practice Schedules C was $577,285.00 for 1987 and $442,262.00 for 1988.

Moreover, the testimonial and documentary evidence, contrary to petitioner's assertion, fully supports the stipulation with respect to the substantial amounts of unreported income for both years.

Issue 3.  Additions to Tax for Fraud

Respondent determined that petitioner is liable for the fraud addition to tax under section 6653(b)(1)(A) and (B) for 1987, and under section 6653(b)(1) for 1988.  Section 6653(b)(1)(A) and section 6653(b)(1) both provide that if any part of any underpayment of tax required to be shown on a return is due to fraud, then an amount equal to 75 percent of the

portion of the underpayment due to fraud shall be added to the tax. Section 6653(b)(1)(B) also provides for an additional addition to tax of 50 percent of the interest payable under section 6601 for that part of the underpayment that is due to fraud. If respondent proves that any part of the underpayment is due to fraud, the entire underpayment shall be treated as due to fraud unless petitioner can show by a preponderance of the evidence that part of it is not due to fraud. Sec. 6653(b)(2).

Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To satisfy this burden, respondent must prove that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. 654, 661 (1990).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Fraud is not presumed and must be established by independent evidence of fraudulent intent. Edelson v. Commissioner, supra. Fraud may be shown by circumstantial evidence because direct evidence of the taxpayer's fraudulent intent is seldom available. Gajewski

v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).

Courts have developed several indicia or badges of fraud which include: (1) Understatement of income, (2) inadequate books and records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failure to cooperate with tax authorities, (7) filing false returns, (8) failure to make estimated tax payments, (9) dealing in cash, (10) engaging in illegal activity, and (11) attempting to conceal illegal activity. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). This list is nonexclusive. Miller v. Commissioner, 94 T.C. 316, 334 (1990). Although petitioner contends otherwise, several indicia of fraud are present in this case.

a. Petitioner's Sophistication and Experience

The sophistication and experience of a taxpayer are relevant in deciding whether fraud exists. Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Petitioner was a highly intelligent, astute, and successful

physician and businessman. He was thoroughly familiar with his business and financial interests, and he controlled them. Consequently, it is unlikely that he would not have realized that his Federal tax liabilities were substantially underreported for 1987 and 1988.

b. <u>False Returns</u>

Respondent contends, and correctly so, that the doctrine of collateral estoppel bars petitioner from contesting any issues actually litigated during his criminal trial. <u>Considine v. United States</u>, 683 F.2d 1285 (9th Cir. 1982). He was found guilty of willfully subscribing to a false return for 1987 and 1988. Thus, this indicium of civil fraud is conclusively established. <u>Stobaugh v. Commissioner</u>, T.C. Memo. 1984-112.

c. <u>Understatements of Income</u>

Substantial understatements of income in successive years, when coupled with other circumstances showing an intent to conceal or misstate income, justifies the inference of fraud. <u>Holland v. United States</u>, 348 U.S. 121, 137 (1954); <u>Patton v. Commissioner</u>, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148.

In this case petitioner intentionally failed to report gross income from his medical practice in the amounts of $175,285 for 1987 and $191,979 for 1988. These understatements represented a 30-percent omission of income for 1987 and a 43-percent omission

for 1988. Petitioner admitted that he knew this omitted income was taxable. He also admitted that he made copies of the checks he received from various attorneys who paid him for medical services rendered to numerous personal injury patients. These understatements are strong evidence of fraud. Truesdell v. Commissioner, 89 T.C. 1280, 1302 (1987).

   d. Inadequate Books and Records

A taxpayer's failure to maintain adequate and accurate records is indicative of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172.

Here petitioner maintained certain records that were convenient for his use, he destroyed other records, and he failed to maintain records that would have accurately reflected his income in 1987 and 1988. We think his records were intentionally incomplete. He had patients sign a sheet when they arrived at his office. The retention of these sheets could have assisted him in determining his income each year. But, instead, the sheets were destroyed each day. Further, there was no evidence of any ledger cards maintained to assist in recordkeeping. Petitioner only copied the checks from attorneys, and he stated that the purpose for this action was to assure that he was paid. By comparison, he obviously was not concerned with having an accurate tax record of the income he received from those attorneys.

e.  Concealment of Income or Assets

The concealment of income or assets is an indicium of fraud. Bradford v. Commissioner, supra at 307-308.

The facts clearly show that petitioner concealed substantial amounts of income by his actions.  During the civil examination by Ms. Davis, the revenue agent, petitioner did not furnish any statements to her pertaining to his Shearson investment account until she discovered a canceled check payable to Shearson.  In addition, he never provided statements to Ms. Davis regarding his investment account at the Howard, Weil Company, despite substantial deposits made to it.

Petitioner intended to conceal income by cashing some 300 checks at Circle Food Store and Liberty Bank, rather than First Federal, his own bank, and then telling Mr. Bruno, his accountant, and Ms. Davis that all income checks he received from attorneys were deposited into his First Federal checking account.

Furthermore, petitioner did not tell Mr. Bruno or Ms. Davis that he exchanged checks from attorneys for First Federal bank checks, that the exchange would not be reflected in his First Federal checking account, and that he deposited the bank checks into his investment accounts.  Without such information neither Mr. Bruno nor Ms. Davis would have known that the income existed. Thus, petitioner withheld necessary information that misled his accountant and the revenue agent.

f.  Implausible or Inconsistent Explanations of Behavior

Petitioner maintains that he did not intend to fraudulently understate his income for 1987 and 1988.  His actions, however, are consistent with those of a person possessing the intent to defraud.  For example, petitioner asserts that he gave Mr. Bruno net income figures for his medical practice and that Mr. Bruno made a mistake by placing net income on the gross income line of Schedule C.  This assertion is factually implausible and unsupported by the evidence.  Mr. Bruno repeatedly testified, and we think truthfully so, that the income figures given to him by petitioner for 1987 and 1988 were the amounts of petitioner's total gross income for each year.  Petitioner not only failed to tell Mr. Bruno there was a mistake on the gross income line of the Schedule C, but he also never mentioned this error to Ms. Davis during the civil examination.  Consequently, it is difficult to believe that petitioner could have failed to notice that the total amount of the checks he received from personal injury attorneys so greatly exceeded his reported gross income. The more plausible explanation of his alleged discovery of this so-called mistake, however, is that there was no mistake.  It was merely petitioner's explanation designed to shift the culpability and blame away from himself.

As further support for his reliance argument, petitioner emphasized that he knew nothing about taxes, recordkeeping, or

bookkeeping.  Yet his testimony illustrated that his feigned ignorance was nothing more than an attempt to conceal his knowledge of his intentional understatement of income.  Moreover, he admitted that he knew that all of the checks from the various attorneys were income to him and that he was required to report this income on his returns.  He stated that he knew almost all of the attorneys would not file Forms 1099 with the Internal Revenue Service, reporting their payments of income to petitioner.  As such, it was imperative that he maintain adequate records.  See Aflalo v. Commissioner, T.C. Memo. 1994-596.

In fact, petitioner made a copy of each check, and at trial he testified that he kept a list containing a running tally of the checks.  Although these records were more than adequate to determine gross income, petitioner conveniently failed to give such records to Mr. Bruno.  We note that after respondent's examination began, the same types of records were given to Mr. Bruno for the preparation of the 1989 and 1990 returns.  When questioned why the list and copies of the income checks were not given to Mr. Bruno for the preparation of the 1987 and 1988 returns, especially since he gave Mr. Bruno all the canceled checks necessary to substantiate expenses, petitioner's only response was that Mr. Bruno did not ask him for his income records.  The more believable explanation is that petitioner did not give Mr. Bruno the list and copies of his income checks because he intended to understate his income for 1987 and 1988.

g.  Failure To Cooperate With Respondent's Agent

Failure to cooperate in the examination and investigation of tax liabilities is an indicium of fraud.  Gajewski v. Commissioner, 67 T.C. at 200.  This record is replete with evidence that petitioner did not cooperate with Ms. Davis during her civil examination.  He withheld records and documents.  He misled her.  He did not intend to cooperate.  We think he only did what he thought was necessary to keep respondent's agent from discovering his fraudulent scheme to hide his unreported income.

h.  Conclusion as to Fraud

Accordingly, after considering all the facts and circumstances present in this record, we find and hold that petitioner is liable for the additions to tax for fraud with respect to the amounts of the underpayments for 1987 and 1988.

Issue 4.  Additions to Tax for Substantial Understatements

Section 6661(a), as applicable to 1987 and 1988, provides for an addition to tax if there is a substantial understatement of income tax for any taxable year.  The addition to tax is in the amount of 25 percent of the underpayment attributable to the substantial understatement.  Respondent determined that petitioners substantially understated their income tax for 1987 and 1988, resulting in section 6661(a) additions to tax in the amounts of $16,871 and $12,355, respectively.

Section 6661(b)(1) provides that an understatement is substantial if (1) it exceeds 10 percent of the tax required to

be shown on the return, or (2) $5,000.  By this definition the understatements for both years were substantial and the 25 percent addition to tax applies.

Under section 6661(b)(2), which defines an understatement, petitioners' deficiencies in the amounts of $67,485 for 1987 and $49,419 for 1988 constituted understatements.  Section 6661(b)(2)(B) provides for a reduction for an understatement (1) if there was substantial authority for the tax treatment of the subject item, or (2) if the subject item's tax treatment was adequately disclosed on the return.  Petitioners' understatements do not qualify for any reductions under this definition.

Accordingly, respondent's determination on this issue is sustained.  Petitioners are liable for the section 6661(a) additions to tax.

## Issue 5.  Additions to Tax for Negligence

Having found that petitioner is liable for the fraud additions to tax for 1987 and 1988, it follows, as conceded by respondent, that neither petitioner nor Mrs. McKenna is liable for the additions to tax for negligence.

## Issue 6.  Statute of Limitations for 1987

Petitioners have affirmatively pleaded in their petition and contend that the assessment of additional taxes for 1987 is barred by expiration of the 3-year period of limitations under section 6501(a).  However, as provided in section 6501(c)(1), the tax may be assessed at any time in the case of a false or

fraudulent return with the intent to evade tax.  Because we have found that petitioner's 1987 income tax return was fraudulent, it follows that the assessment of additional taxes for that year is not barred by expiration of the period of limitations.

In view of the foregoing,

<u>Decision will be entered under Rule 155</u>.